UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| CONSTANCE H. WAWRZYNIAK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:18-CV-108 JD |
| | ) |
| NANCY A. BERRYHILL, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **OPINION AND ORDER**

Constance Wawrzyniak applied for supplemental security income on behalf of her son, R.J.W., around the time he began high school. R.J.W. attended school, held a part-time job, and even played varsity sports. His mother alleges, though, that his type 1 diabetes and attention deficit hyperactivity disorder rendered him disabled. An administrative law judge disagreed and denied the claim. R.J.W. appeals, but he has not presented any basis for reversal, so the Court affirms the Commissioner's decision.

### I. FACTUAL BACKGROUND

R.J.W.'s mother filed an application for supplemental security income on his behalf in June 2014. At that time, R.J.W. was fourteen years old and was about to enter high school. She claimed that R.J.W. was disabled, primarily as a result of his diabetes and attention deficit hyperactivity disorder. R.J.W. had been diagnosed with type 1 diabetes in November 2012, and his diabetes was well-controlled for some time after that by regular insulin injections. He had also been diagnosed with attention deficit disorder, for which he took Ritalin. In 2014, R.J.W.'s blood sugar levels began rising, prompting his doctor to adjust his insulin doses. By 2015, his

doctor wrote that his diabetes was "in suboptimal control," (R. 423), and by 2016 his doctor wrote that his diabetes was "in poor control." (R. 554).

In March 2016, R.J.W. began seeing a new doctor to treat his diabetes, Dr. Shruti Fadia, an endocrinologist. At the initial appointment, Dr. Fadia noted that R.J.W.'s "overall glycemic control is fair," but she suspected that R.J.W. was not complying with his treatment regimen. (R. 576). Dr. Fadia noted that R.J.W. did not appear to be checking his blood sugars regularly and was not taking insulin injections as often as he needed. He was also eating large snacks without taking any insulin. Dr. Fadia discussed with R.J.W. the "importance of checking blood sugars prior to all meals" and administering appropriating insulin injections to correct his blood sugar levels. (R. 576). At the next appointment in June 2016, though, Dr. Fadia again noted that R.J.W. was "not compliant with his regimen." (R. 568). His testing device showed only 19 entries the previous month, even though R.J.W. was supposed to be checking his blood sugars before every meal. (R. 567). R.J.W.'s level of compliance was similar at the next appointment. In September 2016, Dr. Fadia stated that R.J.W.'s "poor DM [diabetes mellitus] control is due to non-compliance with his DM regimen." (R. 566) Dr. Fadia explained: "Since he is not checking blood sugars regularly, he is frequently missing insulin doses." (R. 566). And despite Dr. Fadia's instructions at previous visits, R.J.W. had continued making the injections in areas of lipohypertrophy (fatty deposits under the skin that can interfere with the absorption of insulin), which Dr. Fadia said was contributing to his elevated blood sugars. (R. 566, 568, 576).

After his application for benefits, R.J.W. also underwent a psychological examination with Dr. Hershberger, an agency consultant. Dr. Hershberger noted that R.J.W. "was inattentive" but "was easily brought back to the examiner's line of questioning." (R. 458). He opined that R.J.W.'s "attention and concentration were questionable," as he "had difficulty maintaining his

2

focus" and "appeared distracted by even minor external stimuli," but was "able to be redirected with effort." (R. 460). Dr. Hershberger diagnosed R.J.W. with attention deficit hyperactivity disorder, inattentive type. He concluded his report by stating, "With the support of his parents [R.J.W.] appears to be functioning well within the normal parameters for someone of his age." (R. 462). One of R.J.W.'s teachers also completed a function report. She noted that R.J.W. had slight problems acquiring and using information, and either slight problems or no problems in various areas relating to attending and completing tasks. (R. 227–28).

By the time of the hearing before an administrative law judge, R.J.W. was halfway through his junior year of high school. He had missed a significant amount of class due to his diabetes—he estimated that he had missed about 20 days' worth of classes the previous year—but he maintained about a C grade point average and was not receiving special education services. He also worked a part-time job, working about ten hours a week as a cook in a restaurant, and he was able to drive himself to school and to work. He had also played on his school's varsity soccer team since his freshman year.

In a written decision issued following the hearing, the ALJ concluded that R.J.W. did not qualify as disabled. He found that R.J.W.'s severe impairments included diabetes and attention deficit hyperactivity disorder, but that R.J.W. did not meet or medically equal any of the listings. Accordingly, he evaluated R.J.W.'s degree of limitations in six different domains in order to determine whether R.J.W. functionally equaled a listing. As relevant here, he concluded that R.J.W. had "less than marked" limitations in the domains of Attending and Completing Tasks and Health and Physical Well-Being. Because R.J.W. did not have "marked" or "extreme" limitations in any domain, the ALJ found that R.J.W. did not qualify as disabled. The Appeals

3

Council denied review of that decision, so R.J.W.'s mother, by counsel, filed this action on his behalf.

## II. STANDARD OF REVIEW

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Ultimately, while the

4

ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

### III. STANDARD FOR DISABILITY

Under Supplemental Security Income rules, a child is disabled if he has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations" that "has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). This assessment requires a three-step analysis. 20 C.F.R. § 416.924(a); *Jelinek v. Astrue,* 662 F.3d 805, 809–10 (7th Cir. 2011). At step one, if the child is engaged in substantial gainful activity, then he is not disabled. *Id*. At step two, if the child does not have a severe medical impairment or combination of impairments, then he is not disabled. *Id*. At step three, a child will qualify as disabled only if his impairments "meet," "medically equal," or "functionally equal" any of the listings contained in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id*.

To determine if a child's impairments are "functionally equivalent" to a listing, an ALJ analyzes their severity in six "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1); *see Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); *Sanchez v. Barnhart*, 467 F.3d 1081, 1082 (7th Cir. 2006) (since children do not generally have work history, the structure of the disability program for them necessarily differs from that for adults, and focuses on the functioning of the child in specified areas of life activity). For a child to functionally equal a listing, the ALJ must find an "extreme" limitation in one domain or "marked" limitations in two domains. 20 C.F.R. § 416.926a(a), (e)(2)(i).

A "marked" limitation is one that "interferes seriously with [a claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation represents functioning between two and three standard deviations below the mean. A limitation is "extreme" if it "interferes very seriously with [a claimant's] ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(3)(i). It represents functioning at least three standard deviations from the mean. The regulations also note that, in the domain of Health and Physical Well-Being, a claimant with extreme limitations would typically meet or medically equal a listing (meaning the ALJ would not reach these domains to determine functional equivalence). *Id.* § 416.926a(e)(3)(iv).

## IV. DISCUSSION

R.J.W. raises four grounds for reversal. First, he argues that the ALJ failed to adequately consider the opinion evidence. Second, he argues that the ALJ erred in considering his non-compliance with his treatment. Third, he argues that the ALJ should have found greater limitations as to his concentration, presumably referring to the domain of Attending and Completing Tasks. And fourth, he argues that the ALJ should have found greater limitations in the domain of Health and Physical Well-Being due to his absences from school.

The Court notes at the outset, though, that counsel's arguments are skeletal and superficial to the point that they verge on being forfeited in their entirety. Counsel refers to broad categories of objections or cites general propositions like the need to draw a logical bridge. But he largely fails to develop arguments by addressing what the ALJ actually said, and then citing to applicable caselaw and to evidence in the record to show how the ALJ erred. In some arguments, counsel reargues the evidence and asks the Court to draw a different conclusion than the ALJ— which the Court has no authority to do—or misrepresents the evidence. Counsel also failed to submit a summary of the plaintiff's medical history, as ordered, [DE 14], and instead offered a

6

one-page filing that merely lists various diagnoses and makes improper legal arguments.[1] [DE 16-1].

As Judge Simon recently observed, "a reviewing court has a right to expect more." *Crump v. Berryhill*, No. 3:17-cv-557, 2018 WL 4627217, at *1–2 (N.D. Ind. Sept. 27, 2018). It is not the Court's job to construct arguments for the parties or to scour the record to find evidence to support those arguments. *Id.*; *see also Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("We will not scour a record to locate evidence supporting a party's legal argument. Perfunctory or undeveloped arguments are waived."); *Waggoner v. Berryhill*, No. 3:17-cv-222, 2018 WL 4292963, at *4 (N.D. Ind. Sept. 10, 2018). That said, the Court addresses each argument in turn.

**A.     Opinion Evidence**

R.J.W. first argues that the ALJ failed to properly address various sources of opinion evidence. He begins by arguing that the ALJ should have given controlling weight to two pieces of evidence: the medical management plans for his diabetes, which were provided to or maintained by his school for his sophomore and junior years. (R. 791–92, 813–14). Those plans reflect R.J.W.'s testing and insulin regimen, and advise the school on what action to take if his blood sugar is too high or too low.

The regulations in effect at the time of R.J.W.'s application required an ALJ to give controlling weight to "medical opinions" from a "treating source," if those opinions are

---

[1] Counsel has been admonished in all of these respects before. *Kelham v. Berryhill*, 751 F. App'x 919 (7th Cir. 2018) (faulting counsel for overstating and misstating the record); *Frazee v. Berryhill*, 733 F. App'x 831, 834 (7th Cir. 2018) (holding that counsel's arguments were waived because they were "undeveloped" or were "not adequately present[ed]" to the district court); *Higdon v. Berryhill*, No. 3:18-cv-47, 2018 WL 5801403, at *1 (N.D. Ind. Nov. 6, 2018) (noting that "counsel failed to meaningfully comply with this Court's briefing order").

supported by the record. 20 C.F.R. § 404.1527(c)(2).[2] R.J.W. makes no effort to establish either that these records contain medical opinions or that they were offered by a treating source. He asserts that the "instructions were the equivalent of medical opinions." [DE 16 p. 19]. However, he does not cite the regulation defining medical opinions, nor does he identify what these records said or offer any argument for why that makes them medical opinions.

These records were not prepared by a treating source, either, such that they could have received controlling weight. A treating source must be an "acceptable medical source," 20 C.F.R. § 404.1527(c)(2), such as a licensed physician, § 416.913(a). The second record R.J.W. cites appears to have been prepared by personnel at R.J.W.'s school, not by his treating physician or any medical source. It even states that the instructions are "per mother and [R.J.W.] (not recommended by physician)." (R. 813). The first record R.J.W. cites at least came from his doctor's office, but it was not prepared by an acceptable medical source, either. It was signed by a nurse practitioner (R. 792), which the regulations do not define as an acceptable medical source. 20 C.F.R. § 416.913(a) (defining acceptable medical sources), *id.* § 416.913(d)(1) (noting that nurse practitioners are not acceptable medical sources); *see also Turner v. Astrue*, 390 F. App'x 581, 586 (7th Cir. 2010) ("A nurse-practitioner . . . is not a 'treating source.'"). Thus, contrary to R.J.W.'s conclusory assertions, neither of these records could have given controlling weight under the regulations, and the ALJ correctly declined to evaluate them in that manner.

Moreover, R.J.W. does not identify what in these records the ALJ should have given controlling weight to, or how that would have affected the ALJ's analysis. It would thus be difficult to find that any error in this respect would be harmful. In addition, the ALJ did not

---

[2] The Court refers to the regulations as they existed at the time of R.J.W.'s application, though some of the relevant regulations have since been revised.

ignore this evidence. He acknowledged the medical management plan from R.J.W.'s sophomore year. (R. 30 "It was noted that the claimant needed supervision in calculating the correct insulin dose, administering the insulin injection, and calculating carbohydrates."). He also acknowledged instructions offered for the following school year. (R. 31). R.J.W. does not address (or acknowledge) the ALJ's analysis in that regard, but argues solely that the ALJ erred by failing to give these materials controlling weight. As just discussed, that is incorrect.

Next, R.J.W. offers a general argument that the ALJ erred in evaluating other opinions in the record because he used the terms "some" weight and "little" weight in his evaluation of those opinions. R.J.W. argues that these terms are not sufficiently specific to permit meaningful review. The Court agrees that those terms are unilluminating on their own. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). In reviewing an ALJ's decision, though, a court's focus is not limited to the adjective an ALJ uses to describe the weight given to an opinion. Rather, courts look to the reasoning an ALJ offers and whether it shows that the ALJ adequately considered the regulatory factors and allows the Court to trace the ALJ's analysis. 20 C.F.R. § 404.1527(f)(2) ("The adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning[.]"); *see Britt Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018) (holding that "[n]o further explanation was required" when the ALJ "explained that he gave 'great weight'" to a doctor's opinion because the opinion "was consistent with the objective medical evidence"); *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012) ("[W]e require only that the ALJ 'minimally articulate' his reasoning.").

The Court cannot review any alleged error in that aspect of the ALJ's analysis, though, as R.J.W. does not identify any particular opinions as to which he believes the ALJ erred. The

9

entirety of his argument is that the terms "some" weight and "little" weight are not specific enough to permit review. The Court agrees, as far as that goes. But the ALJ's analysis of the various sources of opinion evidence does not consist solely of announcing the amount of weight given to the opinions. Rather, he offered explanations for how he viewed each source's opinions, and then discussed those opinions as part of his analysis of each of the six domains. R.J.W. does not take issue with the ALJ's analysis in that respect or develop any argument for how those discussions were inadequate. The Court cannot find that the ALJ erred in evaluating those opinions if it cannot discern which opinions R.J.W. is even referring to, much less how he believes the ALJ's analysis of those opinions was flawed.

For example, the ALJ stated that he gave the opinions of the state reviewing consultants "little weight," explaining that the consultants "did not have the benefit of being able to review the evidence presented at the hearing level." (R. 32). R.J.W. does not identify those opinions or argue that the ALJ's reason for giving them little weight was insufficient. Nor would those opinions alter the outcome of his claim—the first two consultants opined that R.J.W. had no limitations in the first five domains and less-than-marked limitations in the sixth (R. 97–98), and the next two likewise opined that his limitations were the same as or less than those found by the ALJ. (R. 109).

The ALJ likewise addressed the opinions of Dr. Hershberger, the consulting examiner. The ALJ explained that Dr. Hershberger's opinions "are consistent with his clinical interview of the claimant, and his personal observations." (R. 32). Then, in his discussion relative to each of the six domains, the ALJ identified the evidence upon which he relied, which included the aspects of Dr. Hershberger's report that he found pertinent to each domain. (R. 33–38). By spelling out what evidence the ALJ relied on in each domain, the ALJ's opinion allows the Court

10

to trace his reasoning in evaluating Dr. Hershberger's opinion. Again, R.J.W. does not acknowledge the ALJ's analysis or develop any argument for how the ALJ erred in this respect. The Court thus cannot reverse on this ground.

**B.       Non-Compliance**

R.J.W. next argues that the ALJ erred in considering his non-compliance with his diabetes treatment. In evaluating the degree of R.J.W.'s limitations, particularly in the domains of Caring for Yourself and Health and Physical Well-Being, the ALJ attributed some of R.J.W.'s difficulties to his con-compliance with his treatment. (R. 37–38 (noting that R.J.W. "has demonstrated the ability to monitor his health and care for himself" but that he sometimes chose not to)]. R.J.W. claims that his failure to test his blood sugar and administer appropriate insulin injections was not his fault, but a sign of inadequate supervision. He argues that the ALJ played doctor because he "put[] the burden of compliance on the adolescent, something that ultimately the physician was not willing to do." [DE 16 p. 19–20]. That's not correct, though. To the contrary, R.J.W.'s treating physician was sharply critical of R.J.W. for failing to comply with his treatment, and opined that his poor control over his diabetes was because of his non-compliance.

In March 2016, R.J.W. began seeing Dr. Fadia, an endocrinologist, to treat his diabetes. At his first appointment with R.J.W., Dr. Fadia stated that she "suspect[ed] non-compliance with his DM [diabetes mellitus] regimen." (R. 30, 576). She noted that R.J.W. "does not appear to be checking blood sugars regularly and is therefore missing insulin doses," and that he "also eats large snacks without taking any insulin." *Id.* Dr. Fadia discussed with R.J.W. the need to check his blood sugars before every meal and to administer appropriate doses of insulin. *Id.* R.J.W.'s appointment in June did not show improvement; his glucometer showed that he had only tested his blood sugar 19 times in the last month, even though he was supposed to test his blood before every meal. (R. 567). Dr. Fadia stated: "He is not compliant with his regimen. Glucometer

11

download revealed very few accuchecks. Since he is not checking blood sugars regularly, he is also missing bolus doses." (R. 30, 568). Dr. Fadia "[r]eiterated the importance of checking blood sugars" and administering injections, and also discussed the complications that can result from poorly controlled diabetes. (R. 568).

At an appointment the following month with R.J.W.'s primary care physician, the doctor noted, "Very infrequent testing and poor blood sugar control due to infrequent testing." (R. 609). In September, R.J.W. returned for another appointment with Dr. Fadia. Dr. Fadia noted that the "glucometer download shows that accuchecks are obtained sporadically," and R.J.W.'s mother reported that he "tends to estimate insulin doses frequently" instead of testing. (R. 31, 565–66). Dr. Fadia stated that R.J.W.'s "poor DM [diabetes mellitus] control is due to non-compliance with his DM regimen. Since he is not checking blood sugars regularly, he is frequently missing insulin doses. Also continues to use areas of lipohypertrophy[3] for insulin injections even though he has been advised not to at prior visits." (R. 566).

In light of this evidence, which the ALJ's opinion discussed, the ALJ was not playing doctor in concluding that R.J.W. was non-compliant. As the Commissioner notes, "the ALJ did not deem Plaintiff non-complaint; Plaintiff's doctor did." R.J.W.'s brief does not acknowledge this evidence or the ALJ's discussion on that topic. And even though the Commissioner pointed out this evidence in its response, R.J.W. did not file a reply to contend that anything remains of this argument in light of that evidence. Thus, the Court cannot find that this presents a basis for reversal either.

---

[3] Lipohypertrophy is a fatty deposit under the skin that can be caused by insulin injections and that can interfere with insulin being absorbed into the body. Dr. Fadia had advised R.J.W. on multiple occasions prior to this visit not to administer injections in areas where this had developed. (R. 568, 576).

## C. Attending and Completing Tasks

R.J.W. next argues that the ALJ erred in evaluating his limitations in concentration, presumably in reference to the domain of Attending and Completing Tasks. He primarily argues that the ALJ should have found greater limitations based on the consulting examiner's report. He notes that Dr. Hershberger observed that R.J.W.'s "attention and concentration were questionable," that he "had difficulty maintaining his focus on the examiner's questions" and "appeared distracted by even minor external stimuli," but that he was "able to be redirected." (R. 460). R.J.W. asserts that Dr. Hershberger's opinions necessarily equate to marked limitations, so the ALJ erred in finding to the contrary.

The only support for that assertion, though, is counsel's own say-so. R.J.W. cites no authority for the proposition that Dr. Hershberger's opinions reflected marked limitations, nor any evidence in the record making that connection. In fact, both sets of agency reviewing consultants considered Dr. Hershberger's opinions, and neither found that R.J.W. had marked limitations. (R.97, 109). And though R.J.W. focuses on Dr. Hershberger's observations that he was easily distracted, Dr. Hershberger also noted that R.J.W. "was easily brought back to the examiner's line of questioning" and that his "stream of thought was logical and goal-directed." (R. 458). Dr. Hershberger also concluded his report by opining that R.J.W. "appears to be functioning well within the normal parameters for someone of his age." (R. 462). The ALJ considered and weighed this evidence in finding that, while R.J.W. did have limitations in this domain, those limitations were less than marked. (R. 33–34). R.J.W. may wish that the ALJ had evaluated the evidence differently, but just as an ALJ cannot play doctor, neither can a plaintiff's counsel (or the Court) play ALJ. *See Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (stating that a court "cannot substitute its own judgment for that of the SSA by reevaluating the

facts, or reweighing the evidence to decide whether a claimant is in fact disabled"); *Lopez*, 336 F.3d at 539.

R.J.W. also argues that the ALJ should not have considered his teacher's report that he had "no problem sustaining attention during play/sports activities." (R. 34) He argues that coaches constantly redirect players during sports activities, so this is not evidence of less-than-marked limitations. Again, that is nothing more than rearguing the evidence. As the ALJ discussed, R.J.W.'s teacher noted that he had "no problem paying attention when spoken to directly, no problem sustaining attention during play/sports activities, and no problem carrying out single-step, and multistep instructions," and "only a slight problem in focusing long enough to finish [a]n assigned activity, and refocusing to task when necessary"—all of which supports the ALJ's finding. (R. 34 (citing R. 228)). The ALJ's finding in this domain was thus supported by substantial evidence.

### D.     Health and Wellbeing

Finally, R.J.W. argues that the ALJ erred in finding that his limitations in the domain of Health and Wellbeing were less than marked. The sole basis for this argument is his assertion that he "missed over 50% of the school days in his sophomore and junior years," which he argues must equate to "marked" or "extreme" limitations. [DE 16 p.23]. Counsel does not cite to the record to support that assertion, so the Court could find this argument waived on that basis alone. The problem is more serious, though; it is not just that counsel omitted a record citation, but that this assertion is simply unsupported.

R.J.W. did not miss over half of his school days. R.J.W. testified at the hearing that he missed about 20 days the last year (R. 74)—a far cry from over half of the year. The calculation for missed school that R.J.W. offers elsewhere in his brief—from which counsel may be embellishing to reach this assertion—includes both days in which he was absent and days in

which he was tardy to any class during the school-day. [DE 16 p. 8 (noting that R.J.W. "missed *or was tardy* on 94 days" (emphasis added))]. In asserting that R.J.W. "missed over 50% of the school days," counsel is misrepresenting the record.

Perhaps counsel could have argued that the amount of school that R.J.W. actually missed should result in "marked" or "extreme" limitations. That is not the argument he made, though, and the Court will not entertain arguments founded on inaccuracies. And even if counsel had accurately recounted the record, the result would be the same. As the Commissioner argues, the ALJ acknowledged R.J.W.'s absences from school as a result of his diabetes, but concluded that R.J.W. had the ability to control his diabetes but chose not to. (R. 38; *see also* R. 37 ("[T]he claimant has demonstrated the ability to monitor his health and care for himself to facilitate doing the things he wants to do, such as playing sports and work[ing] at a part-time job, but often elects not to utilize that ability when doing something he is less excited about doing—attending classes at school.")). R.J.W. does not acknowledge the ALJ's analysis in that respect or offer any argument for why it is unsound. And as already discussed, the ALJ did not err in considering R.J.W.'s non-compliance. Accordingly, this is not a ground for reversal.

## V. CONCLUSION

For those reasons, the Court finds that the Commissioner's decision is supported by substantial evidence, so it AFFIRMS the Commissioner's decision and DIRECTS the Clerk to enter judgment accordingly.

SO ORDERED.

ENTERED: March 25, 2019

/s/ JON E. DEGUILIO
Judge
United States District Court